**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KIMBERLY BOLANOS, | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | No. 14 CV 7533 |
| | ) | |
| NORTHEASTERN ILLINOIS UNIVERSITY, | ) | |
| DANIEL WEBER, and SHARON HAHS, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendants. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Kimberly Bolanos, a Caucasian woman, worked in the registrar's office of Northeastern Illinois University ("NEIU") under the supervision of the University Registrar, Daniel Weber. Bolanos disapproved of the practices of several other workers, who, she claims, came to work late, misreported their time, and engaged in personal activities while at work. Bolanos confronted these other workers from time to time; after one such confrontation, another employee claimed that Bolanos had created a hostile and threatening work environment. After a hearing, NEIU terminated Bolanos's employment. Bolanos sued NEIU, Weber, and NEIU's president, Sharon Hahs, asserting a host of claims: race and sex discrimination; retaliation; violations of procedural and substantive due process; violation of the Stored Communications Act, arising from NEIU's blocking access to Bolanos's e-mail account; retaliatory discharge; and intentional infliction of emotional distress ("IIED"). Defendants have moved for summary judgment on all counts. The court previously dismissed some claims against Weber and Hahs, and now grants summary judgment to all Defendants on all remaining claims.

**BACKGROUND**

**I.      Factual History**

Plaintiff Kimberly Bolanos was a graduate student at NEIU, and began working there in June 2007 as a Graduate Assistant—is it unclear what this position entailed. (Am. Compl. ¶ 10 [25]; Defs. Weber and Hahs's Answer to Am. Compl. [44] ¶ 10.) Beginning in June 2009, she

was employed in the Registrar's office, in a position referred to as the Assistant Registrar of Graduate Records or, sometimes, Coordinator of Graduate Records. (Defs.' Local Rule 56.1 Statement of Facts in Supp. of Mot. for Summ. J. [63] ("DSOF") ¶ 8.) In May 2012, Avril Murray was hired as a Graduate Records Representative, under Bolanos's supervision. (DSOF ¶ 11.) Bolanos herself reported to Daniel Weber, the University Registrar;[1] she and Murray were the only employees in the Graduate Admissions and Records Department who reported to him, though Weber also oversees other offices. (DSOF ¶¶ 6, 11–12.) Bolanos testified that she had supervised student workers, but stopped supervising them when she began to report to Weber.[2] (DSOF ¶ 8; Pl.'s Statement of Additional Material Facts [71] ("PSOAF") ¶ 131.) Bolanos was the only one of three assistant registrars[3] who occasionally worked late on special projects. (DSOF ¶ 81.) Weber assigned these projects to Bolanos because of her database management skills, and Bolanos earned positive job evaluations during her employment at NEIU. (DSOF ¶ 81; PSOAF ¶ 117.) Before being placed on administrative leave in 2014, Bolanos had limited interaction with the President of NEIU, Sharon Hahs. (DSOF ¶ 7; Pl.'s Resp. to DSOF [71] ¶ 14.)

At various times during her employment with the Registrar, Bolanos observed that other NEIU employees failed to adhere to policies regarding tardiness, absenteeism, personal

---

[1] Bolanos may not have reported to Weber for the entire time she was an assistant registrar, but did for the period relevant to the complaint. (*See* Defs. Weber and Hahs's Answer to Am. Compl. [44] ¶ 11 ("Plaintiff reported to Weber beginning on October 1, 2011."))

[2] After she began reporting to Weber, Bolanos did not directly supervise the student workers, but she would sometimes direct them to perform tasks if their own supervisors were away when the students arrived. (Dep. of Kimberly Bolanos, Ex. 3 to DSOF [63-4] 36:5–39:1.) It appears that supervising student workers was not part of her job description when she began her new position reporting to Weber, so she relinquished that responsibility.

[3] The court has no information about the other assistant registrars.

activities at work, and time reporting. In the spring of 2009,[4] Bolanos told administrators, including the associate dean of the graduate college, that an employee named Martha Narvaez Vasquez ("Narvaez") had been late for work, or absent. (PSOAF ¶ 106; Dep. of Kimberly Bolanos, Ex. 3 to DSOF [63-4] ("Bolanos Dep.") 125:23–127:3.) She observed that Alice Pennamon,[5] an African-American employee, was frequently absent beginning in 2011, and that Murray began socializing frequently at work in September 2013. (DSOF ¶ 73; PSOAF ¶¶ 99, 102.) On unspecified dates, during staff meetings with Weber, Bolanos also raised concerns about other employees' submitting inaccurate or fraudulent time cards. (Def.'s Resp. to PSOAF ¶ 107 [74]; Dep. of Avril Murray, Ex. 11 to DSOF [63-12] ("Murray Dep.") 47:9–16, 49:7–12.) In 2012, Bolanos participated in a mediation moderated by NEIU Ombudsperson Bradley Ginn with Murray, Narvaez, and other NEIU employees, to address their interpersonal problems and improve teamwork.[6] (DSOF ¶ 13.) At the discussion, Ginn gave all employees suggestions on how to improve their relationship—Bolanos does not say what those suggestions were, but she testified that other employees agreed to inform the office when they would be late or absent. (DSOF ¶ 13; Bolanos Dep. 136:24–141:11.) Beginning in the fall of 2013, however, several further conflicts arose between Bolanos and other employees, as described below.

### A. September 18, 2013 Incident with Avril Murray

On September 18, 2013, there was a confrontation between Bolanos and Murray regarding Murray's interaction with a student. (DSOF ¶ 15.) Bolanos claims that the student had not completed her degree requirements and that the head of the student's academic department would not permit her to graduate. (Bolanos Dep. 148:6–152:20.) Bolanos testified

---

[4]     Bolanos did not become an assistant registrar until June 2009, so it appears that Bolanos made these observations before she began her new position.

[5]     Bolanos does not know Pennamon's job title. (Bolanos Dep. 38:7–13.)

[6]     It is unclear who or what prompted this discussion, but it appears it was the tension created by Bolanos's observing rules infractions. (*See* Bolanos Dep. 136:24–141:11.)

that Murray "had ongoing issues with" the same faculty member, though Bolanos was uncertain of the faculty member's name and did not describe Murray's alleged "issues" with this faculty member. (*Id.*) According to Bolanos, Murray's questioning the student about the faculty member caused the student to become upset. (Pl.'s Resp. to DSOF ¶ 15.) Bolanos and Murray both became agitated. (DSOF ¶ 16.) Weber testified that he counseled Murray about this incident,[7] while Murray herself said that she did not receive any discipline for it.[8] (Pl.'s Resp. to DSOF ¶ 17.) With respect to Bolanos, Weber issued a reprimand, a harsher response than counseling; he explained that he holds supervisors, including Bolanos, to a higher standard than non-supervisors. (DSOF ¶¶ 17–18.) Weber also directed, or at least suggested, that Bolanos take anger management classes, and Bolanos did so.[9] (Pl.'s Resp. to DSOF ¶ 20; DSOF ¶ 82.) At some unknown point later, other employees learned that Bolanos was taking anger management classes. It is unclear how they found out; Weber told Bolanos he did not know who made that information public. (DSOF ¶ 82.) Bolanos notes that on September 20, a few days after the September 18 incident, Murray left the main office doors unlocked but was not disciplined—presumably a violation of policy, but the record does not reveal how serious it was. (PSOAF ¶ 111.)

---

[7]     Weber distinguishes counseling from other forms of discipline: "Q: Did you discipline Avril Murray for raising her voice to her supervisor?  A: I counseled her on the appropriateness.  I did not discipline her from a verbal or written reprimand perspective." (Dep. of Daniel Weber, Ex. 4 to DSOF [63-5] 57:22–58:2).  Weber nonetheless acknowledged that counseling was the first step in the civil service employee disciplinary process.  (*Id.* at 25:19–26:2.)

[8]     Bolanos also cites her own deposition in support of the contention that Murray was not disciplined, but the cited testimony does not support that claim.  (Pl.'s Resp. to DSOF ¶ 17.)

[9]     Defendants claim these classes were mandated, while Bolanos claims they were only suggested.  (Pl.'s Resp. to DSOF ¶ 20.)  Yet Bolanos also testified that she was "required by the university to take anger management classes."  (Bolanos Dep. 87:18–88:15.)

## B.    November 4, 2013 Incident with Verla Grays

On November 4, 2013, there was an incident between Bolanos and Verla Grays, who held the title of Graduate Admissions and Records Supervisor, and reported to Steven Pajak, the Associate Director of Admission Review and Processing (it is unclear where this falls in the hierarchy with respect to the registrar). (DSOF ¶¶ 22–23; Dep. of Steven Pajak, Ex. 18 to DSOF [63-19] 7:3–9.) Grays supervised Narvaez. (DSOF ¶ 24.) Bolanos became upset because Grays was angry and interrupted Bolanos in her office; Grays claimed that she did so because Bolanos refused to help answer the main office phone. (Pl.'s Resp. to DSOF ¶ 27.) On November 11, Tressa Randolph, a representative from NEIU Human Resources, followed up in response to a request from Bolanos's anger management counselor for information about Bolanos's progress.[10] (DSOF ¶ 29; Ex. 19 to DSOF [63-20].) In response to Randolph's inquiry, Weber told her about the incident with Grays. (DSOF ¶ 29; Ex. 19 to DSOF [63-20].) In particular, Weber e-mailed Randolph that "[t]here appears to have been a confrontation with another employee" and that "[i]f accurate, then Kim [Bolanos] has not had professional, respectful, and appropriate oral conversations with NEIU staff[,]" but he acknowledged he still needed to "piece together what occurred." (Ex. 19 to DSOF [65-20].)

Neither Grays nor Bolanos was disciplined for this incident; Bolanos claims Grays was given leniency because she was new to her supervisory position. It is not clear whether Weber himself was involved in Grays' lack of punishment (DSOF ¶¶ 30–31; Bolanos Dep. at 82:8–83:9), but he testified that neither Grays nor Bolanos was disciplined because both were considered to be partially at fault. (DSOF ¶¶ 30–31.) Grays told Bolanos that she was too hard to work with, and also said "You can't expect me to be nice to you when I'm mad at you." (DSOF ¶ 28; PSOAF ¶ 112.) Bolanos claims that neither Weber nor Pajak, Grays's supervisor,

---

[10]    Bolanos acknowledged that Randolph and Weber were the only two NEIU employees who were supposed to know about her anger management classes. (Bolanos Dep. 87:18–88:15.)

responded properly to these comments, though it is unclear whether they were aware of them. (PSOAF ¶ 112.)  Bolanos does not specify how she believes Weber or Pajak should have responded, but she complained that Grays "wasn't reprimanded for her unprofessional behavior."  (Bolanos Dep. 83:22–84:3.)

### C.    January 15, 2014 Incident with Martha Narvaez

On January 15, 2014, Bolanos "yell[ed] at" Narvaez for being late to work.  (Pl.'s Resp. to DSOF ¶ 32.)  Narvaez claims she was less than ten minutes late (DSOF ¶ 32; Ex. 20 to DSOF [63-21]), and that, although Bolanos did not directly threaten her, Bolanos's loud reaction made Narvaez feel unsafe.  (DSOF ¶ 32; Dep. of Martha Narvaez Vasquez, Ex. 10 to DSOF [63-11] ("Narvaez Dep.") 54:16–55:14.)  Narvaez reported this incident to her own supervisor, Grays.  (DSOF ¶ 33.)  Whether Narvaez was disciplined for tardiness is uncertain; Narvaez testified that Grays gave her a verbal warning, but Grays testified she never gave any warnings as a supervisor.  (Pl.'s Resp. to DSOF ¶ 34.)

Following the January 15, 2014 confrontation, Narvaez, a civil service union employee, complained to the union, which filed a union grievance against Bolanos for workplace harassment.[11]  (DSOF ¶ 35.)  Narvaez also complained to Randolph that Bolanos harassed her; Bolanos agrees with Defendants' characterization that she "micromanaged" Narvaez, though she was not Narvaez's supervisor.  (DSOF ¶ 35; *see* Narvaez Dep. 22:13–18.)  Narvaez also spoke with NEIU's Behavioral Concern Team (DSOF ¶ 37) which, Narvaez explained, "deals with people that might not be stable, that might be a risk of hurting someone in the university." (Narvaez Dep. 59:15–20.)  Randolph investigated Narvaez's complaint, and scheduled a meeting with Bolanos to discuss the incident.  (DSOF ¶¶ 36, 77.)  To do so, Randolph contacted Weber (DSOF ¶¶ 36, 77; Bolanos Dep. 76:8–77:10), perhaps because she and Weber had already discussed the incident.  Weber himself neglected to tell Bolanos about the meeting

---

[11]    Narvaez testified alternatively that she filed the grievance, and that the union filed the grievance after she complained.  (Narvaez Dep. 14:11–15:9.)

because it "slipped his mind." (DSOF ¶¶ 36, 77.) Bolanos did, however, attend the meeting, because Randolph eventually told her about it directly. (DSOF ¶ 77; Bolanos Dep. 76:11–77:5.) The outcome of this meeting and Randolph's investigation is unclear; Bolanos claims the complaint was dropped as unfounded, but the union grievance proceeded.[12] (Pl.'s Resp. to DSOF ¶ 36; Def.'s Resp. to PSOAF ¶ 104.)

Also in January, Bolanos had a meeting with Weber, for reasons not explained in the record. (PSOAF ¶ 122.) During this meeting, Bolanos began crying and told him that Murray and Narvaez were "trying her patience;"[13] Weber expressed sympathy and told her he was trying to help her. (PSOAF ¶ 122.) Bolanos asked that her desk be moved, but Weber declined, explaining that she needed to remain close to Murray, whom Bolanos supervised. (PSOAF ¶ 135.) Weber instructed Bolanos to stop monitoring the time and attendance of employees she did not supervise. (DSOF ¶ 38; Dep. of Daniel Weber, Ex. 4 to DSOF [63-5] ("Weber Dep.") 44:9–12.) He directed that she not confront such employees, but instead report them to Weber or another supervisor. (DSOF ¶ 38; Weber Dep. 44:9–12.) It is undisputed that Bolanos did not adhere to this directive; instead, she continued to track and confront other employees she did not supervise. (DSOF ¶ 39.)

### D. Alleged Harassment and Complaints to Weber

During the time that Bolanos and Narvaez were employed at NEIU, Bolanos complained to several individuals—Pajak, Weber, Randolph, and others—that Pajak and Grays did not discipline Narvaez in the same manner that Bolanos disciplined Murray. (DSOF ¶ 69.) Bolanos believes that this inconsistency contradicts what the parties refer to as the "universal disciplinary

---

[12]     Although the complaint and the grievance both appear to have been catalyzed by the same incident, they appear unrelated procedurally: Narvaez herself filed the complaint with NEIU, her employer, and NEIU Human Resources was responsible for investigating. (Dep. of Tressa Randolph, Ex. 13 to DSOF [63-14] 13:8–20.) The grievance, on the other hand, was an action filed by the union itself. (*Id.* at 11:9–12:7.)

[13]     Bolanos also states that she told Weber that Murray and Narvaez were trying to get her fired, but the cited testimony does not support that statement. (PSOAF ¶ 122).

process" for civil service employees. (Pl.'s Resp. to DSOF ¶ 64; Weber Dep. 25:5–11.) Bolanos confirmed that the inconsistent disciplinary practice was not linked to race; she testified that her complaints "had absolutely nothing to do with the color of anyone's skin[.]" (DSOF ¶ 70; Bolanos Dep. 134:22–135:4.) Bolanos, Murray, Weber, and Hahs are Caucasian, while Narvaez is Hispanic and Grays is African-American; Bolanos, Murray, Narvaez, Grays and Hahs are all female, while Weber is male. (DSOF ¶¶ 3, 5, 7, 10, 11, 22.)

Bolanos claims that Weber knew that Grays, Murray, Narvaez, and Pennamon "yell[ed] at and harass[ed]" her, but she identifies only a few specific incidents of alleged harassment in her statements of facts. (DSOF ¶¶ 72–73, 75.) First, she complains that she was often required to cover for employees who did not show up for work. (DSOF ¶ 75.) Second, in the spring of 2012, Bolanos heard her coworkers loudly complaining about racism on the part of "certain employees." (Bolanos Dep. 133:6–13; 136:14–21.) Third, Bolanos claims that her coworkers were "standing right next to [Bolanos's] cubicle voicing loud comments about how lucky [she was] that their God has allowed them to forgive people like [her.]" (Bolanos Dep. 66:19–24.) Bolanos asserts that Weber knew about this purported harassment and allowed her coworkers' abusive behavior to continue. (DSOF ¶¶ 72–73, 75; Bolanos Dep. 66:19–24, 133:6–13, 136:14–21.) Bolanos says that she informed Tressa Randolph about these issues, as well, but the only evidence she cites for this assertion is testimony about her communications with Randolph about the January 2014 incident involving Narvaez. (Pl.'s Resp. to DSOF ¶ 71; Bolanos Dep. 172:14–175:24.)

### E.    Class Action Union Grievance and March 13, 2014 Incident

On March 13, 2014, Bolanos was served with a union grievance. (DSOF ¶ 40.) The grievance, filed as a class action,[14] alleged that Bolanos did not provide a respectful workplace,

---

[14]    The parties do not explain what a class action grievance is, or how it differs from a regular grievance. (*See* Dep. of Tressa Randolph, Ex. 13 to DSOF [65-14] 42:15–17) (Q: Do you know what the difference between a regular grievance and a class action grievance is?  A:

citing the incidents with Murray and Narvaez. (DSOF ¶ 40; Grievance Form, Ex. 23 to DSOF [63-24].) Weber knew about the grievance before Bolanos did but did not tell her about it.[15] (DSOF ¶ 78.) Murray and Narvaez, who were (unlike Bolanos) civil service employees and union members, discussed the grievance with the union president without letting Bolanos that they were doing so. (DSOF ¶¶ 8, 17, 35; Pl.'s Resp. to DSOF ¶ 41.) When she received a copy of the grievance, Bolanos began to cry. (Pl.'s Resp. to DSOF ¶ 42.) The timeline of these events is somewhat unclear; the parties do not say how soon it was after Murray and Narvaez met with the union president that Bolanos received the grievance. In any case, Bolanos asked Murray where she had been, and Murray did not disclose that she had met with the union president, instead claiming that she had been in the bathroom. (Pl.'s Resp. to DSOF ¶ 42.) Bolanos confronted Murray in her cubicle, raising her voice and moving closer to Murray (DSOF ¶¶ 42–43);[16] Murray claims Bolanos did not say anything specifically about the grievance, but did ask Murray whether she "want[ed] to stick with [the bathroom] story[.]" (Murray Dep. 62:15–63:4.) Weber was not present when Bolanos received the grievance, but Bolanos spoke to him about it soon afterwards, and she claims that Weber responded by telling her he "had no time for the drama." (PSOAF ¶ 134; Bolanos Dep. 113:5–17.)

After this confrontation (for which Narvaez was also present, possibly because she had been with Murray at the meeting with the union president), Murray and Narvaez informed Weber

---

No.") The grievance form itself, however, has a place for "Employee Name." (Ex. 23 to DSOF [65-24].) Instead of Narvaez's or other employee's name, "Class Action" is written. (*Id.*) The court assumes, therefore, that a class action grievance is one brought on behalf of all (or at least a subset of) the union's employees, as opposed to a single employee.

[15] It is unclear precisely when or how Weber learned of the grievance. Bolanos claims he learned of it in January 2014 (DSOF ¶ 77), but she cites her own deposition testimony concerning Weber's knowledge of Narvaez's complaint to Randolph in Human Resources, not the union grievance. As explained above, the complaint and grievance appear to have generated different processes: the complaint was a process internal to NEIU, while the union initiated the grievance.

[16] Bolanos disputes this fact, but cites to no contradictory evidence.

and the Associate Vice President for Enrollment Management Services, Dr. Harring-Hendon,[17] about the incident, and told Weber and Harring-Hendon that they felt unsafe and threatened by Bolanos. (DSOF ¶¶ 43–44.) Murray told Weber that she did not want to work for Bolanos anymore, and Narvaez told him she was afraid of retaliation. (DSOF ¶ 45–46.) At Weber's direction, Bolanos went home for the day at 4:00 p.m., and then she took a vacation day the next day. (DSOF ¶ 48.) Bolanos testified that, when he sent her home, Weber told her that it was easier for him to send Bolanos home than to send two civil service employees (Narvaez and Murray) home. (PSOAF ¶ 105; Bolanos Dep. 78:5–79:12.) At some point, possibly the same day, Narvaez informed Randolph, the Employee Labor Relations Manager who had investigated the January 2014 incident, about Bolanos's reaction after receiving the grievance. (DSOF ¶ 47; Dep. of Tressa Randolph, Ex. 13 to DSOF [65-14] 26:8–27:13.) At some unspecified time, Narvaez also contacted the NEIU Police Department. (DSOF ¶ 46.)

### F. Investigation and Termination

Together with staff from Human Resources (their names are not in the record), Weber investigated the circumstances surrounding the March 13, 2014 confrontation, interviewing Bolanos, Grays, and Murray.[18] (DSOF ¶ 49.) Human Resources placed Bolanos on paid administrative leave beginning on March 14, 2014.[19] (DSOF ¶ 50.) While Bolanos was on administrative leave, Randolph directed her not to come to NEIU or contact anyone from work. (PSOAF ¶ 128; Bolanos Dep. 80:8–81:1.)

---

[17]    It is unclear where Dr. Harring-Hendon fits in the hierarchy of employees.

[18]    He also interviewed another office employee, Terenda Jones, but all he could recall of her position was that it was one of "extra help." (Weber Dep. 54:22–55:3.) Jones's role in the conflicts involving Bolanos, if any, is not in the record.

[19]    Randolph testified that Marta Maso, the director of Human Resources, was usually the person who decided when to place an employee on administrative leave, but Randolph did not know that for certain. (Dep. of Tressa Randolph, Ex. 13 to DSOF [65-14] 20:15–17.)

As part of its own investigation, the NEIU Police Department interviewed employees (the record does not specify who) and conducted a background check of Bolanos. (Bolanos Termination Hr'g Tr., Ex. 15 to DSOF [63-16] 274–6.) Following the investigation, the NEIU Chief of Police, James Lyon, determined that Bolanos was a threat to other employees. (Ex. 15 to DSOF at 277.) NEIU officials (again, not identified) concluded that Bolanos created a hostile work environment and recommended she be terminated. (DSOF ¶ 51; Ex. 15 to DSOF at 277; Weber Dep. 54:4–12.)[20] Bolanos disputes that she created a hostile environment or a threat, but does not challenge NEIU's assertion that this was the reason for termination.[21] (Pl.'s Resp. to DSOF ¶ 51.)

Weber, Randolph, Lyon, Harring-Hendon, Director of Human Resources Marta Maso, and Assistant Vice President for Business Affairs Craig Duetsch recommended Bolanos's termination (presumably to Hahs, though that is unspecified). (DSOF ¶ 53.) Hahs wrote to

---

[20]     The NEIU Police Department background check revealed that Bolanos had a criminal history and a Firearm Owner's Identification Card. (DSOF ¶ 51.) There is no evidence that Bolanos had a gun or physically touched anyone in the office. (Def.'s Resp. to PSOAF ¶ 125.) Defendants claim that the investigation revealed that Bolanos had been terminated from a previous position for violence, but it is unclear when NEIU learned that information. (Pl.'s Resp. to DSOF ¶ 52.) Bolanos contends "there was no basis for [her] being an alleged threat" at her previous job, and "she was dismissed to prevent a racial discrimination lawsuit." (PSOAF ¶ 127). No one at NEIU confronted Bolanos about this history. (Def.'s Resp. to PSOAF ¶¶ 126–27.)

[21]     Bolanos claims to dispute several facts that she does not contradict with conflicting evidence; the court treats such facts as admitted. This paragraph of Defendants' statement of facts is one such example. Defendants assert in this paragraph that "it was determined that Plaintiff had created a hostile work environment and there was a legitimate concern for the safety of NEIU staff which warranted Plaintiff's termination." (DSOF ¶ 51.) Bolanos disputes this paragraph, citing to evidence contesting whether she actually did create a hostile work environment or pose a threat, but none that contests NEIU's statement about why it sought her termination. Bolanos does cite Lyon's testimony that he did not speak with anyone from HR about his investigation of Bolanos's confrontation with Narvaez and Murray; but Lyon also testified that he "discuss[ed] the direction that [HR was] going to go and [HR] wanted more information from [Lyon] from the University police perspective," presumably about Lyon's investigation. (Bolanos Termination Hearing Transcript, Ex. 15 to DSOF [63-16] at 277.) Of course, the fact that the NEIU police chief did not specifically discuss the incident with Narvaez and Murray with HR does not contradict the assertion that NEIU administrators concluded that Bolanos created a hostile work environment.

Bolanos, notifying her that NEIU was seeking her termination for creating a hostile and threatening workplace on April 1, 2014. (DSOF ¶ 54.) On April 7, Bolanos requested a hearing pursuant to her right under NEIU regulations. (DSOF ¶ 55; Ex. 28 to DSOF [65-29] 21.) The termination hearing was held on May 9, 2014 before a committee of five employees. (DSOF ¶ 57.) Consistent with NEIU regulations, two of these employees (David Leamon and Mary Hay Verne) were selected by Bolanos.[22] (DSOF ¶ 57; Ex. 27 to DSOF [63-28]; Ex. 29 to DSOF [63-30].) Of the remaining three (Janice Alexander, Judy Brewer, and Luigi Pezzarossi), two were selected by NEIU, and the four employees together selected the fifth. (DSOF ¶ 57; Ex. 27 to DSOF [63-28]; Ex. 29 to DSOF [63-30].) Lyon, Murray, Narvaez, Grays, and Weber testified at the hearing. (DSOF ¶ 59.) Bolanos claims that Weber "lied" at the hearing by stating that Bolanos had not complained about her coworkers' tardiness as much as Bolanos claims she had. (DSOF ¶ 86.)

The committee recommended that Bolanos's employment be terminated. The committee concluded that, although Bolanos made no specific threats, she "exhibited threatening behavior and intimidated her co-workers." (DSOF ¶ 60; Ex. 27 to DSOF [63-28].) As President of NEIU, Hahs placed the matter of the proposed termination on the Board of Trustees' agenda. (DSOF ¶ 61.) NEIU procedure requires that Hahs meet with the employee or attempt to communicate regarding possible remedial actions before a notice of intent to terminate is issued. (Pl.'s Resp. to DSOF ¶ 61.) Bolanos claims that Hahs did not follow these procedures, and that Hahs recommended her termination "with no physical evidence." (DSOF ¶ 91; Pl.'s Resp. to DSOF ¶ 61.) On June 12, 2014, the Board of Trustees voted to accept the recommendation to terminate Bolanos. (DSOF ¶ 62.) The NEIU police escorted Bolanos to retrieve her belongings and Weber inspected them for sensitive information. (DSOF ¶ 87.) Bolanos testified that she had never seen other employees escorted and have their belongings

---

[22] The parties have not directed the court to information about the positions or titles of these employees.

inspected; she conceded, however, that she does not know whether other former employees she observed had been terminated.  (DSOF ¶¶ 87–88; Bolanos Dep. 96:13–97:11.)

### G.  Bolanos's E-mail Account

Bolanos maintained an NEIU e-mail address, which she used in both her capacity as a student and as an employee of NEIU.  (DSOF ¶ 9.)  When she was placed on administrative leave, Bolanos asked Randolph to set up an auto-reply message for her e-mail.  (Pl.'s Resp. to DSOF ¶ 83.)  Someone did place an auto-reply on her account the following week.  (Bolanos Dep. 90:3–91:18.)  At some point after this, Bolanos told Human Resources employee Marta Maso that Weber was "flooding" her e-mail with test messages for the auto-reply.  (Bolanos Dep. 91:13–18.)  She also e-mailed several NEIU employees, including Hahs, from that account while she was on leave.  (DSOF ¶ 90; Bolanos Dep. 92:9–24.)  Hahs never met with Bolanos. (DSOF ¶ 90.)

The account was deactivated on May 5, 2014, four days before Bolanos's termination hearing, and Bolanos received a new e-mail account for education purposes.  (DSOF ¶ 56.) Bolanos claims that other former NEIU employees retained access to their email accounts, but she does not know if those former employees were discharged.[23]  (DSOF ¶ 84.)  Bolanos claims that being locked out of her old e-mail account has interfered with her ability to finish her graduate degree at NEIU because she had files and correspondence related to her education in the blocked account.  (DSOF ¶ 92; Bolanos Dep. 192:17–193:6.)

### H.  Proceedings After Bolanos's Termination

On May 6, 2014 (three days before the termination hearing), Bolanos filed a Charge of Discrimination with the Illinois Department of Human Rights and the Equal Employment

---

[23]     One of these former employees was Randolph, who was herself terminated from NEIU in April 2015 for her job performance.  (Dep. of Tressa Randolph, Ex. 13 to DSOF [63-14] 8:10–24.)  Randolph's e-mail account was also terminated.  (Pl.'s Resp. to DSOF ¶ 85.)  There is no indication her discharge had anything to do with Bolanos.

Opportunity Commission. (DSOF ¶ 94.) Bolanos also mailed an ethics complaint[24] to NEIU, which she says outlined various grievances, including "timekeeping, the coming and going, filing fraudulent timekeeping, [and singling Bolanos] out for punishment," though Bolanos does not say whether she identified specific workers engaged in the alleged wrongdoing. (Bolanos Dep. 184:13–21.)

## II.    Procedural History

Bolanos filed her original complaint on September 26, 2014 against NEIU, alleging claims of sex, race, and national origin discrimination, and retaliation under Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983; due process violations under 42 U.S.C. § 1983; violations of the Stored Communications Act ("SCA"), 18 U.S.C. § 2701, and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; and state law claims of intrusion on seclusion, retaliatory discharge, and IIED. (Compl. [1].) NEIU moved to dismiss all but the Title VII claims on sovereign immunity grounds. (Def.'s Mot. to Dismiss Portions of Pl.'s Compl. [10].) This court granted that motion without prejudice on February 18, 2015. (Minute Entry [24]; Tr. of Proceedings, Feb. 18, 2015 [79].) The court noted that Bolanos's § 1981 and § 1983 claims against NEIU were barred by sovereign immunity, and that the other claims were also barred absent an immunity waiver for such claims. (Tr. of Proceedings [79] 4:1–18.) The court granted Bolanos leave to amend to address the sovereign immunity issue for those claims and to make a claim for prospective relief, if appropriate.[25] (Tr. of Proceedings [79] 3:18–4:4, 4:10–5:16.)

In her amended complaint filed on March 11, 2015, Bolanos withdrew her claim under Computer Fraud and Abuse Act and the intrusion-on-seclusion claim, and added Weber and

---

[24]    The parties have not provided a copy of this ethics complaint, nor a citation to any NEIU regulations that govern such complaints.

[25]    Bolanos's original complaint named only NEIU, a state agency. Even a claim for injunctive relief is barred by sovereign immunity when it is brought against the State itself. *Cory v. White*, 457 U.S. 85, 91 (1982). But a state *official* does not necessarily receive sovereign immunity when the plaintiff seeks prospective relief. *Edelman v. Jordan*, 415 U.S. 651, 676–77 (1974) (citing *Ex parte Young*, 209 U.S. 123 (1908)).

Hahs as Defendants in their individual and official capacities. (Am. Compl.) The amended complaint alleges, against all Defendants: sex discrimination under Title VII (Count I); race and national origin discrimination under Title VII (Count II); retaliation under Title VII (Count III); violation of procedural and substantive due process under § 1983 (Count IV); sex, race, and national origin discrimination and retaliation under § 1983 (Count V); sex, race, and national origin discrimination and retaliation under § 1981 (Count VI); retaliatory discharge (Count VIII); and IIED (Count IX). She alleged a violation of the SCA against NEIU only (Count VII).[26] Aside from removing two claims and adding two defendants, the allegations in the amended complaint are virtually identical to those in the original complaint.

Defendants Weber and Hahs moved to dismiss all but the § 1983 claim alleging sex, race, and national origin discrimination. Bolanos conceded that the Title VII and retaliatory discharge claims should be dismissed against Weber and Hahs, and the court dismissed the claims against those Defendants. (Defs. Weber and Hahs's Partial Mot. to Dismiss [34] 2, 10; Minute Order [43]; Tr. of Proceedings, Jul. 15, 2015 [50] 2:13–19.) The court also dismissed the due process clams in Count IV and dismissed the § 1981 claim in Count VI because there is no private right of action against state actors under § 1981. (Tr. of Proceedings [50] 2:22–3:24); *Campbell v. Forest Pres. Dist. of Cook Cty.*, 752 F.3d 665, 671 (7th Cir. 2014). As for Count V (violation of § 1983), the court dismissed the retaliation aspect of the claim, and all of the official-capacity claims. (Tr. of Proceedings [50] 4:4–12, 5:10–20.) The court denied the motion with respect to Count IX (IIED). (Tr. of Proceedings [50] 5:21–6:13.) Thus, all claims in the amended complaint remain against Defendant NEIU, and the claims remaining against Defendants Weber and Hahs are: Count V (sex, race and national origin discrimination under 42 U.S.C. § 1983) and Count IX (IIED), in their individual capacities.

---

[26] In her response to Weber and Hahs' motion to dismiss, Bolanos claimed that Weber and Hahs "waived" any argument with respect to Count VII. The court notes, however, that Count VII of the complaint is directed against Defendant NEIU only.

**DISCUSSION**

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *J.S. Sweet Co. v. Sika Chem. Corp.*, 400 F.3d 1028, 1032 (7th Cir. 2005). The court will give the plaintiff "the benefit of all conflicts in the evidence and all reasonable inferences that might be drawn from the evidence, without necessarily vouching for their objective accuracy." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554 (7th Cir. 2014). The court construes the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *O'Connor v. DePaul Univ.*, 123 F.3d 665, 669 (7th Cir.1997).

**I.     Title VII Sex, Race, and National Origin Discrimination (Counts I & II)**

Plaintiff alleged that Defendant NEIU discriminated against her on the bases of her race, sex, and national origin.[27] In determining whether these claims survive summary judgment, the court considers the evidence as a whole to determine whether a reasonable jury could find that a prohibited factor influenced the challenged employment decision. As the Court of Appeals recognized in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016), the court need not determine whether evidence "can be labeled 'direct' or 'indirect[;]'" such distinctions do not comport well with the fact-intensive analysis in discrimination cases. *Id.* at 765. Under *Ortiz*, the court must simply consider "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* In making the assessment, the court considers all evidence, whether previously characterized as direct or indirect, which can include: admissions of discriminatory intent, whether similarly situated employees outside the

---

[27]     Bolanos makes no arguments about national origin discrimination. She does not know the national origin of Grays, Murray, Narvaez, or Pennamon. (Pl.'s Resp. to DSOF ¶ 74.) Bolanos also acknowledges that she, Weber, and Hahs share the same national origin, having all been born in the United States. (Pl.'s Resp. to DSOF ¶¶ 3, 5, 7.) The court concludes that Bolanos has abandoned her national origin discrimination claims.

plaintiff's class received systematically better treatment, whether the employer's reason for the adverse employment action was legitimate or a pretext, whether the plaintiff met the employer's legitimate expectations, suspicious timing, and the employer's comments or behavior toward employees of the same class. *See Bagwe v. Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879–80 (7th Cir. 2016), *cert. denied*, 137 S. Ct. 82 (2016); *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014). The court will also consider evidence that a plaintiff was in a protected class, *Bagwe*, 811 F.3d at 880, or, if the plaintiff is in a majority group, "background circumstances [that show] the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand." *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) (quoting *Ballance v. City of Springfield*, 424 F.3d 614, 617 (7th Cir. 2005)).

"In a discrimination case, a materially adverse employment action is one which visits upon a plaintiff 'a significant change in employment status.'" *Boss v. Castro*, 816 F.3d 910, 915 (7th Cir. 2016) (quoting *Andrews v. CBOCS West, Inc.*, 743 F.3d 230, 235 (7th Cir. 2014), *overruled on other grounds by Ortiz*, 834 F.3d at 765). "Such changes can involve the employee's current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Boss*, 816 F.3d at 915. Bolanos has identified at least eighteen examples of what she deems adverse action.[28] (Pl.'s Resp. to DSOF ¶¶ 69–92.) The court first addresses Bolanos's alleged harassment by her coworkers and NEIU's alleged failure to address it. Second, the court explains why many of the events that Bolanos complains of are not adverse employment actions. Third, the court examines factors that might support a finding of discrimination in her discharge, including whether Bolanos's performance met NEIU's legitimate

---

[28] Several of these are referenced in the statements of fact, but not her brief.

expectations, whether Bolanos was treated differently than similarly situated individuals of a different class, and whether the circumstances were otherwise suspicious.

### A. Harassment

First, Bolanos claims that Murray, Grays, and Narvaez harassed her, and Weber did nothing. "An employer is prohibited from requiring employees to work in a discriminatory hostile or abusive environment." *Velez v. City of Chicago*, 442 F.3d 1043, 1047 (7th Cir. 2006). "To survive summary judgment on a hostile work environment claim, [a plaintiff must] establish that: (1) [s]he was subjected to unwelcome harassment, (2) the harassment was based on [her] race, (3) the harassment was severe and pervasive enough to alter the conditions of [her] environment and create a hostile and abusive working environment, and (4) there is a basis for employer liability." *Beamon v. Marshall & Ilsley Trust Co.*, 411 F.3d 854, 863 (7th Cir. 2005). As to the fourth element, NEIU is liable "only if [officials or supervisors] know (or ought to know) what is going on and choose to do nothing (or select ineffectual steps when better ones are available)[.]" *Maalik v. Int'l Union of Elevator Constructors, Local 2*, 437 F.3d 650, 653 (7th Cir. 2006).

If Weber was aware of severe or pervasive racial or sexual harassment and took no action to correct it, then NEIU may be liable. Bolanos makes two claims that her coworkers harassed her. First, she claims that they did not show up to work, so she had to cover for them. (Pl.'s Resp. to DSOF ¶ 75.) Second, she claims that they raised their voices, harassed, and threatened[29] her. (Pl.'s Mem. of Law in Opp'n to Mot. for Summ. J. [70] ("Pl.'s Mem.") 13.) She also claims that Weber knew about the harassment and its impact on Bolanos, but he allowed it.

Assuming that these circumstances constitute harassment, Bolanos has offered no basis for the conclusion that the alleged wrongdoing was motivated by Bolanos's gender or race. There is no evidence that her coworkers were tardy or absent from work because Bolanos is

---

[29] Bolanos has identified no evidence of threats by coworkers, or anyone for that matter.

white or female. And it is apparent that the verbal altercations and other conflicts between Bolanos and her coworkers occurred because Bolanos wanted to see her coworkers disciplined for rule infractions—discipline that the coworkers presumably would not have welcomed. Bolanos's coworkers may have reacted hostilely to her efforts to correct them, but Title VII does not cover "all boorish or even all harassing conduct." *Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 808 (7th Cir. 2001); *see Jones v. Res-Care, Inc.*, 613 F.3d 665, 671 (7th Cir. 2010) ("A plaintiff's subjective determination of tension in the workplace, without more, cannot constitute an adverse employment action absent a tangible job consequence."). Grays made negative comments after a dispute about interruptions and workplace civility, but nothing about these comments suggests a racial motivation (Grays's status as an African-American is, of course, not evidence of any such motivation). Similarly, there is no evidence that Narvaez's complaints about Bolanos had anything to do with her race, sex, or any reason beyond resentment of Bolanos's "yelling" at her. As for the fact that Bolanos's attending anger management classes became known to her coworkers, there is no evidence of who made that information public, let alone any unlawful motivation for the disclosure.

Bolanos offers no evidence that any of the alleged harassment was gender-based, and her evidence of racial motivation is similarly far too thin to support a verdict in her favor on this claim. Her assertion that her coworkers "call[ed] her a racist for enforcing the [NEIU] policies" and that Weber took no action in response (Pl.'s Resp. to DSOF ¶ 72), fails for two reasons. First, the evidence suggests that her coworkers were motivated by Bolanos's outlook on the NEIU rules—not by her race. More significantly, these comments neither mentioned Bolanos's name, nor were they directed at her (Bolanos Dep. 133:23–134:21); instead, "there [were] little comments being made at the front counter . . . never mentioning [Bolanos's] name but they would be at the counter saying, 'Certain people around here are racist. . . .' And [another coworker] mentioned to [student workers] that she thought it was racist intent." (Bolanos Dep. 133:8–134:6.)

A suggestion on the part of other workers that unnamed persons were motivated by race is insufficient to establish that Bolanos experienced a hostile environment. "[R]elatively isolated instances of non-severe misconduct will not support a claim of a hostile environment." *Whittaker v. N. Illinois Univ.*, 424 F.3d 640, 646 (7th Cir. 2005) (quoting *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993)). In *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993), the defendant "asked [the plaintiff] for dates, called her a 'dumb blond,' put his hand on her shoulder several times, placed 'I love you' signs in her work area and attempted to kiss her in a bar." Yet the court held that even those much more overt incidents were "relatively isolated" and did not constitute harassment. *Id.* Here, it is not even clear that there was more than one instance of comments made at the front counter, and the comments were not directed at her and did not mention her by name. Thus, even if NEIU or Weber knew of these comments and allowed them to occur, this claim of harassment does not survive summary judgment.

### B.    Not Actionable as Adverse Employment Actions

Bolanos complains about other incidents as well, but several of these incidents do not rise to the level of adverse employment action. For example, Bolanos claims that she was subject to harsher discipline than Murray and Grays for the same incidents. In order for disciplinary measures to be actionable, they ordinarily must be accompanied by "tangible job consequence[s.]"[30] *Jones*, 613 F.3d at 671; *see Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) ("[W]ritten reprimands without any changes in the terms or conditions of his employment are not adverse employment actions."); *Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 847 (7th Cir. 2007) ("[N]ot every criticism or disciplinary measure is an 'adverse employment action' for Title VII purposes.").

---

[30]    In her brief, Bolanos argues that she was "instructed to take anger management classes." (Pl.'s Mem. 12.) But in her statement of facts, Bolanos claims that taking anger management classes was a suggestion, not mandatory. (Pl.'s Resp. to DSOF ¶ 20.) And nothing she offers here satisfies the court that this direction was adverse action.

Before she was placed on leave, none of the discipline imposed on Bolanos resulted in a consequence sufficient to be adverse employment action. Bolanos does not explain how the aftermath of the September and November 2013 incidents materially altered the terms or conditions of her employment. *See Porter v. City of Chicago*, 700 F.3d 944, 954–55 (7th Cir. 2012) ("[The plaintiff] fails, however, to put forth evidence that [issuing a counseling session report] materially altered the terms or conditions of her employment. Absent such evidence, these actions are indistinguishable from the schedule changes and reprimands without material consequences that we have held generally do not constitute adverse employment actions.").

Four other incidents that Bolanos cites as evidence of discrimination also are not adverse, and there is no evidence tying them to Bolanos's race or sex. First, police escorted Bolanos to pick up her personal items after she was terminated, and Weber looked through them—treatment Bolanos claims she had never seen imposed on other employees. Bolanos concedes she is not aware how NEIU officials dealt with other employees who were terminated, however. In any event, this treatment occurred after Bolanos was terminated, so it could not have materially altered the conditions of employment.

Next, Bolanos claims that Weber failed to advise her about a Human Resources meeting regarding the January 2014 incident with Narvaez or about the union grievance.[31] (DSOF ¶ 77–78.) But Bolanos actually attended the HR meeting, and she learned of the grievance when she was served with it. She offers no explanation for how earlier notice, or notice from a different individual, might have changed things. Weber's failure to tell her about the meeting and grievance is not adverse employment action.

Third, Bolanos complains that Narvaez's supervisors did not discipline Narvaez as harshly as Bolanos disciplined Murray. That Grays supervised her employees differently may

---

[31]    It is unclear precisely when Weber learned of the grievance, but both sides apparently agree that he knew of it before Bolanos was served with it. (Pl.'s Resp. to DSOF ¶ 78.)

have made Bolanos's job harder, and she may well be correct that inconsistent enforcement of attendance policies is unwise. But the fact that another supervisor was more lenient than Bolanos cannot be characterized as a significant change in her employment status.

Finally, there is a suggestion that Bolanos believes that she suffered adverse action by being deprived of supervisory responsibility over student workers. (PSOAF ¶ 131.) This is a nonstarter. Bolanos stopped supervising student workers when she became the Assistant Registrar of Graduate Records and started reporting to Weber; this change involved new responsibilities as well as removal of some old ones. This is not adverse employment action.

The court recognizes that even where an incident does not constitute an adverse employment action, it may indicate discriminatory intent. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 739–40 (7th Cir. 2006) ("A negative performance evaluation, however, does not in itself constitute an adverse employment action [but] may serve as [evidence of discrimination].") That is not the case with this evidence: even if Grays intended, by her own leniency, to undermine Bolanos's discipline efforts and did so to interfere with Bolanos's job, there is no sign that she did so because of Bolanos's race. Grays's apparent disagreement with Bolanos's strict enforcement of the rules is a difference in management style, not race discrimination. Similarly, there is no evidence that Bolanos's being escorted by police, Weber's not telling her of the meeting or grievance, or Bolanos's not supervising student workers were related to race or gender.

### C.    Discipline and Termination

It is undisputed that Bolanos was disciplined for altercations with co-workers and ultimately discharged. These are adverse actions, but the court concludes she has not presented evidence that she was disciplined more harshly than similarly-situated workers, or that the circumstances otherwise support an inference of race or sex discrimination.

### 1. Murray and Grays

Bolanos complains that NEIU did not punish Avril Murray for the September 2013 incident. She notes, further, that she herself, but not Murray and Narvaez, was sent home after the episode when Bolanos was served with the grievance. Murray was Bolanos's subordinate and is, like Bolanos, a Caucasian female. The alleged fact that she received lesser discipline does not create an inference of discrimination on the basis of race or gender.

Grays is an African American female, but Weber was not her supervisor, so she is not a useful comparator. *See Franklin v. City of Evanston*, 384 F.3d 838, 847 (7th Cir. 2004) (finding that employees who had different supervisors were not similarly situated); *Snipes v. Illinois Dep't of Corr.*, 291 F.3d 460, 463 (7th Cir. 2002) (finding no abuse of discretion when the court determined that employees with different supervisors were not similarly situated, even though they were subject to the same policies). In any event, as Bolanos recognizes, neither she nor Grays was actually disciplined for the November 2013 incident; Weber told HR about it, but was simply responding to HR's request for information. There is no evidence that Weber or Pajak consciously decided to treat Bolanos and Grays differently, much less that they did so because of Bolanos's race.

### 2. Employees Not Disciplined for Tardiness, Absenteeism, Improper Time Reporting, or Personal Activities

Bolanos sees evidence of discrimination in the fact that other supervisors' lax discipline practices resulted in many employees' not being disciplined for personal activities, time reporting, tardiness, and absenteeism, while she herself was disciplined for confrontations with other employees. (PSOAF ¶¶ 99–102, 106, 107.) In order to show that disciplinary practices reflect discrimination, an employee ordinarily presents evidence that she was "similarly situated with respect to performance, qualifications, and conduct[,]" to those who were disciplined less harshly. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000) *overruled on other grounds by Ortiz*, 834 F.3d 760, 765. "This normally entails a showing that the two employees

dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617–18.

Bolanos was disciplined for her interactions with other employees, and aside from the incidents with Murray and Grays addressed above, none of the alleged comparisons involve employee confrontations. There may have been different discipline for different employees for violations of "the rules," but violations of attendance or record-keeping standards are not sufficiently similar to support an inference that the discipline imposed on Bolanos was based on race or sex. *See Gaines v. K-Five Const. Corp.*, 742 F.3d 256, 263 (7th Cir. 2014) (finding that a tardy employee was not similarly situated to the plaintiff who falsified documents). Moreover, Bolanos refers to lax rules enforcement over a long time period; she describes examples where other employees were not disciplined for absenteeism beginning in 2011. (PSOAF ¶ 99.) Such examples shed no light on the decisions about Bolanos's discipline. That different supervisors enforce some rules more harshly than others may reflect poor management; it does not on its own indicate discrimination.

In fact, there is only one instance in which another employee's attendance transgressions appeared to have any relationship to the discipline imposed on Bolanos: when Narvaez filed a complaint against her after Bolanos scolded Narvaez for tardiness. Narvaez's complaint ultimately led to Bolanos's termination. Bolanos argues that this was discrimination because Narvaez was not disciplined, while "Bolanos was reported to her supervisor, Narvaez's supervisors, Human Resources, and the Union." (Pl.'s Mem. 13.) But Bolanos "was reported" not by NEIU, but by Narvaez, a subordinate of another employee. These actions cannot be attributed to NEIU, and are not examples of disparate discipline.

### 3. Former Employees Retained E-mail Accounts

Finally, Bolanos claims NEIU discriminated against her by setting up an auto-reply message on her e-mail and deactivating her e-mail account. (Pl.'s Resp. to DSOF ¶¶ 83–85.)

Bolanos claims "other NEIU employees retained use of their NEIU [e-mail] after [their] employment *ended.*" (Pl.'s Resp. to DSOF ¶ 84) (emphasis added.) But as Defendants point out, Bolanos does not say whether these employees were terminated, nor does she identify these other employees' race or gender. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. [62] ("Def.'s Mem.") 12.) Bolanos acknowledges she did not know if they had been terminated. (Bolanos Dep. 100:21–102:5.)[32] Tressa Randolph, the only employee the parties know to have been terminated, also suffered deactivation of her account. (Pl.'s Resp. to DSOF ¶ 85.) Randolph is African-American (Pl.'s Resp. to DSOF ¶ 36); that is, Bolanos was treated similarly to a terminated employee of a different race. The deactivation of her e-mail account may have been inconvenient and frustrating, but it was not a function of Bolanos's race or gender. Moreover, it was Bolanos herself who asked that an auto-reply be placed on her e-mail account, so how these circumstances establish discrimination eludes the court.

### D. Legitimate Employment Expectations / Pretext

On the record before the court, there can be little doubt that Bolanos's conflicts with other workers, not her job performance, were the reason for her discharge. The court nevertheless considers Bolanos's argument that she was meeting NEIU's legitimate expectations, but nevertheless discharged. In considering that argument, "[t]he proper inquiry mandates looking at [the plaintiff's] job performance through the eyes of her supervisors[.]" *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008). First, Bolanos points out that it was part of her job to enforce NEIU's policies. (Pl.'s Mem. 11–12.) But Weber told Bolanos to stop enforcing the policies with respect to employees that she did not supervise—instead, he directed that she inform other supervisors. Bolanos claims this is hypocritical: she was hired to

---

[32] Bolanos believes one employee was "laid off" but remained employed by NEIU in a teaching context. (Bolanos Dep. 101:17–102:5.) But all of Bolanos's evidence on this front is her own testimony about what these employees told her, which is inadmissible hearsay. "In granting summary judgment, a district court may consider any evidence that would be admissible at trial." *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016).

enforce the rules, she contends, but stripped of the power to do so. (Pl.'s Mem. 12.) She offers no evidence, however, that she was expected or entitled to enforce the rules outside of her own chain of command. And her responsibility to enforce rules with respect to her subordinates did not give her license to disobey her own supervisor's direct orders.

Bolanos also notes that she had good performance reviews and that Weber gave her special projects. (Pl.'s Mem. 11–12.) A plaintiff who performs well in some aspects of her job may not meet expectations if she also has interpersonal conflicts, however. *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007) (employee did not meet expectations when she completed assignments but sent an abrasive e-mail to coworkers and a client complained about her communication); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 300 (7th Cir. 2004) (employee did not meet expectations when he performed his job well, but had "volatile relations" with coworkers). Bolanos may have had good performance evaluations, but she also had a history of poor personal interactions with coworkers. Further, she admittedly disobeyed a direct order from her supervisor to stop confronting other employees about rules violations and to inform supervisors instead. These circumstances establish legitimate reasons for her discharge in spite of her otherwise satisfactory performance. A court will not "sit as super-personnel to question the wisdom or business judgment of employers." *Gates*, 513 F.3d at 689 (internal quotation marks omitted).

Indeed, Bolanos can point to no other employee who had her record of interpersonal conflict and disobedience. She admittedly points to several incidents where other employees raised their voices, but the evidence shows only that three other employees—Murray, Grays and Narvaez—each had a single confrontation with Bolanos. Bolanos herself, on the other hand, exhibited a pattern of behavior. It was no doubt frustrating to witness tardiness or other violations on the part of other employees, but that does not make NEIU's response to Bolanos's conduct unfair. "[W]hen [considering] whether an employer's justification for dismissing its employee is pretextual, the inquiry is not whether the reason for the firing was a correct

business judgment but whether the decisionmakers honestly acted on that reason." *Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1291 (7th Cir. 1997).

### E. Background Circumstances

Plaintiff has offered no evidence of persons outside her protected category being treated more favorably in similar circumstances. And a plaintiff who, like Bolanos, is not a member of a racial minority but alleges race discrimination may be expected to present "'background circumstances' that demonstrate that a particular employer has 'reason or inclination to discriminate invidiously against whites' or evidence that 'there is something 'fishy' about the facts at hand.'" *Phelan v. City of Chicago*, 347 F.3d 679, 684 (7th Cir. 2003) (quoting *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 455 (1999)). Bolanos attempts to do so here, asserting that it is suspicious that NEIU decided "all of a sudden" to charge her with creating a hostile work environment after Bolanos had worked there for years. (Pl.'s Mem. 14–15.) Bolanos does not bother to explain how this alleged sudden change of course is suspicious—but there was no such abrupt change of course in this case. NEIU officials had been aware of Bolanos's interactions with coworkers for nearly two years: NEIU first took action in 2012 by fostering a mediation. NEIU also did not unilaterally invent a hostile work environment charge; Narvaez was the one who initially made such allegations. When Narvaez filed her grievance and claimed she felt threatened, NEIU took those allegations seriously.

Bolanos also contends NEIU's decision to charge her with creating a hostile work environment is suspicious because she never touched or displayed a weapon to any employee. (Pl.'s Mem. 14.) But physical threats or use of a weapon are not the only bases for a finding of hostility. Similarly, Bolanos argues that micromanaging, counseling, and disciplining employees is not a threat. (Pl.'s Mem. 14–15.) This also does not bolster her argument: NEIU is entitled to "insist on a management style that ensures a smooth operating atmosphere." *Bagwe*, 811 F.3d at 881. Bolanos did not adhere to NEIU's preferred management style.

The other circumstances that trouble Bolanos are that Murray lied to Bolanos about where she was during the grievance meeting, and that Weber refused to move Bolanos's desk at her request. (Pl.'s Mem. 15.) Neither of these circumstances is particularly strange or suspicious, nor is there any basis for the conclusion that they were related to her race. That Murray (Bolanos's subordinate) concealed her meeting from Bolanos had no apparent effect on NEIU's decision to terminate her. Nor is there any evidence that Weber's justification for not moving her desk—that to move Bolanos would put her in a different office from those she supervised—was implausible. (Def.'s Resp. to PSOAF ¶ 135.)

### F. Other Complaints

Bolanos identifies a number of additional instances of alleged discrimination, but none require extensive discussion. First, Bolanos claims that Weber discriminated against her when he told her to stop tracking Narvaez. (DSOF ¶ 89.) At the time Weber gave this order, however, Bolanos's monitoring of other employees' conduct, and confrontations with them, had caused significant office conflict. Weber's desire to minimize that conflict has nothing to do with race or sex.

Second, Bolanos claims she was the only assistant registrar who was required to work late. (DSOF ¶ 81.) Bolanos herself testified, however, that Weber gave her special projects, which sometimes required her to work late, because of her database skills, not because of her race.[33] As noted, Bolanos complains that she stopped supervising student workers when she began to report to Weber, but she never explicitly calls this discrimination and does not explain why this change in assignment was adverse. (PSOAF ¶ 131.) Fourth, Bolanos complains that Weber lied at her termination hearing about how frequently she had protested other employee's tardiness, and that President Hahs did not follow NEIU procedure during the termination

---

[33] Bolanos also notes that she was the only one of three assistant registrars who had to work late, but she does not identify the other two assistant registrars, so the court is unaware of the race or sex of these individuals.

process. As with Bolanos's other claims, there is no indication that these incidents are tied to Bolanos's gender, race, or national origin, nor has she explained how these purported irregularities disadvantaged her. In particular, with respect to Hahs, Bolanos has pointed to no other employees who were terminated where Hahs did follow procedure.

Fifth, Bolanos also complains that Hahs terminated her with no "physical evidence." (Pl.'s Resp. to DSOF ¶ 91.) The court is uncertain what "physical evidence" means in this context; the NEIU committee recommended termination after hearing testimony from five witnesses. (DSOF ¶ 59.) That NEIU terminated Bolanos even though she had no physical contact with other employees does not indicate discrimination.

Finally, the court notes that NEIU terminated Bolanos after a Human Resources investigation, an investigation by the NEIU police, and an NEIU committee hearing. The court knows nothing about the outcome of other investigations, whether any of those other investigations involved interpersonal interactions or a hostile work environment, or the race or gender of any other individuals who were investigated for such matters. Bolanos herself offers no basis from which the court could conclude that Human Resources, the NEIU police, or the committee members were motivated or affected by Bolanos's sex or race.

Bolanos has identified a number of experiences while employed at NEIU that she deems unpleasant. But the sheer number of negative experiences does not prove discrimination. *See Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 763 (7th Cir. 2001) ("[A]n overload of irrelevant or nonprobative facts" does not indicate "evidence of discriminatory intent."). The evidence here would not permit a reasonable factfinder to conclude that Bolanos's gender, race or national origin caused her termination or any adverse employment action. Summary judgment is granted on Counts I and II.

## II. Retaliation (Count III)

Bolanos also claims that she has been retaliated against for attempting to enforce NEIU's policies, and her filing the Charge of Discrimination. NEIU allegedly retaliated by (1)

allowing "select employees to violate NEIU's rules, policies, and procedures[,]" (2) disciplining Bolanos for attempting to enforce those rules, policies, and procedures, (3) terminating her employment, and (4) locking her out of her e-mail account. (Am. Compl. ¶¶ 2, 97.) To prove such a claim, Bolanos must present evidence that she engaged in statutorily protected activity, that she suffered an adverse action, and that there is a causal connection between the two. *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016); *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010)). This claim fails for the same reasons that doomed Bolanos's discrimination claim and for additional reasons as well.

Bolanos claims that her persistent attempts to enforce NEIU policies and her Charge of Discrimination were protected activities. "An employee engages in a protected activity by either: (1) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or (2) opposing an unlawful employment practice." *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

Bolanos's Charge of Discrimination is a protected activity. Her attempts to enforce NEIU policies by complaining about the disparate discipline, however, are not. Bolanos claims that "NEIU's willy-nilly enforcement (and discrimination) in its policies" is an unlawful employment practice. (Pl.'s Mem. 15.) But a plaintiff claiming retaliation "must not only have a subjective (sincere, good faith) belief that [she] opposed an unlawful practice; [her] belief must also be objectively reasonable, which means that the complaint must involve discrimination that is prohibited by Title VII." *Hamner v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 224 F.3d 701, 707 (7th Cir. 2000). Nothing suggests that Bolanos's complaints about lax enforcement of NEIU personnel policy were in reality complaints about sex or race discrimination. Every employee about whom Bolanos complained is, like Bolanos, female, and Bolanos points to no instance in

which she complained that other employees got away with rules violations because of race. To the contrary, Bolanos testified that her complaints had "absolutely nothing to do with the color of anyone's skin." (DSOF ¶ 70).

The only mention of race in this record is Bolanos's 2012 complaint to Weber that other employees insinuated that Bolanos herself was a "racist." Her complaint about this insinuation to Weber is not protected activity. *Compare Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015) (finding protected activity when employees complained that their supervisor "often used racially and ethnically derogatory language in the workplace") *with O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 628, 631 (7th Cir. 2011) (finding no protected activity when an employee complained that a higher-ranked employee, who was not his supervisor, had remarked "that she preferred dating men his age because 'they were more her speed[,]'" because "it involved a single instance of sexually-charged remarks which, however imprudent they may have been, were relatively tame.") Bolanos testified there were "little comments" concerning racism, that one employee (Karen Payne) used the word "racist," but there is no evidence that Bolanos herself was so labelled. (Bolanos Dep. 133:8–135:9.) Unlike in *Castro*, these remarks were not derogatory. Complaints about these "little comments" do not constitute protected activity. In fact, even if they were protected activity, they would not satisfy the causation element: Bolanos had complained of the lack of rule enforcement for some time, so it is unclear why NEIU would choose this moment to retaliate for those complaints. "Suspicious timing by itself will rarely support an inference of retaliation, but it may do so '"[w]hen [the action] follows on the close heels of protected expression[.]"' *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) (first alteration in original) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005)).

Because Bolanos's attempts to standardize discipline were not protected activity, Bolanos's Charge of Discrimination on May 6, 2014 is the only protected activity that could support a retaliation claim. By that date, NEIU's alleged lax and inconsistent discipline had

continued for months, and Weber had already cautioned Bolanos against confronting employees who violated those rules. Bolanos's Charge of Discrimination could not have had any causal relationship to the enforcement practices Bolanos complains about.

That leaves the matters of Bolanos's termination and being locked out of her e-mail account. Termination is unquestionably adverse action, but the sequence of events defeats any inference that termination was in retaliation for Bolanos's charge of discrimination. By the time she filed that charge, NEIU had already informed Bolanos that it was seeking to terminate her employment. There is no basis for the conclusion that NEIU would not have proceeded with the termination, had she not filed her charge, and Bolanos does not claim that the outcome of her hearing would have been different if she had not filed the charge.[34] (Pl.'s Mem. 16.) Instead, Bolanos argues that her termination was not a foregone conclusion, and speculates that NEIU could have changed its course: NEIU officials could have investigated further, Hahs might have disagreed with the hearing committee,[35] or Hahs could have met with Bolanos. But Bolanos offers nothing beyond speculation that any of these things might have happened, and she does not explain how they would have changed the outcome. Causation for a Title VII retaliation claim "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). No such proof appears here.

In *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011), two supervisors had discussed disciplining plaintiff for her combative and demeaning workplace conduct well before her final complaint of discrimination,. Although she was not formally terminated until after that final complaint, the Court of Appeals affirmed summary judgment for

_____

[34] It is not clear when NEIU received the charge, but the court located no evidence that the committee members were aware of it.

[35] Bolanos cites generally to NEIU regulations but does not identify a specific one or explain how they support her argument. (Pl.'s Mem. 16)

the defendant; the fact that the plaintiff's supervisors had already decided to enact some form of discipline meant that protected activity was not the cause for the discipline.  *Id.*  Here, too, Bolanos's charge was not the trigger for her termination: Randolph, Director of Human Resources Marta Maso, and others had made that recommendation by the time she filed her charge.  This distinguishes Bolanos's situation from *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994), where "the decision to discharge [the plaintiff] was made approximately four weeks *after* she complained[.]"  *Id.* (emphasis added).

The deactivation of Bolanos's e-mail account requires little analysis.  The account was deactivated the day *before* Bolanos filed the charge.  The court grants summary judgment on Count III.

## II.    Counts IV through VIII

### A.    NEIU (Counts IV through VI)

Counts IV through VIII allege claims that were dismissed against NEIU on sovereign immunity grounds in the original complaint.  (Minute Entry [24]; Tr. of Proceedings [79] 4:1–18).  Although the court allowed Bolanos to re-plead these claims and address whether the State has waived sovereign immunity on some claims, Bolanos's allegations in the amended complaint are virtually identical to those in the original complaint, and her arguments in her brief are the same as the ones she presented in response to NEIU's motion to dismiss the original complaint.  "[T]he law of the case doctrine embodies the notion that a court ought not to re-visit an earlier ruling in a case absent a compelling reason, such as manifest error or a change in the law, that warrants re-examination."  *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007).

Bolanos's arguments that sovereign immunity is overcome are unpersuasive.  First, Bolanos argues that Eleventh Amendment immunity does not apply because Bolanos "is not a citizen of another state or of a foreign state."  (Pl.'s Mem. 2.)  The Supreme Court concluded over one hundred years ago that sovereign immunity applies even when a plaintiff is a citizen of the same state as the purported state defendant.  *Hans v. Louisiana*, 134 U.S. 1, 10–16 (1890).

Perhaps Bolanos intended to challenge this non-textual rule, which does have its critics. *See, e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 126 (1984) (Brennan, J., dissenting). Bolanos does not make such an argument, however. She instead ignores over a century of precedent. The court declines her implicit invitation to do the same.

Second, Bolanos contends that Illinois has waived sovereign immunity. She points first to the statutory exception to sovereign immunity for actions under Title VII; and indeed, Defendants do not contest that Illinois does not have sovereign immunity for the Title VII claims—those claims were addressed above.

Next, Bolanos argues that, because she seeks prospective relief, immunity does not apply. But a suit against a state agency is barred "regardless of the nature of the relief sought." *Pennhurst*, 465 U.S. at 100. The kind of prospective relief that Bolanos seeks may be available against state officials, but not against the state itself. *See Cory v. White*, 457 U.S. 85, 91 (1982) (finding that Eleventh Amendment immunity applies to equitable remedies).

Bolanos also has one new argument that Count IV, in particular, should overcome sovereign immunity: that NEIU must comply with due process, citing *Alexander v. Northeastern Illinois University*, 586 F. Supp. 2d 905, 912 n.2 (N.D. Ill. 2008): "NEIU must comply with due process under the Fourteenth Amendment." But *Alexander* does not support Bolanos's argument; there, the court concluded that NEIU *was* immune. *Id.* at 913–14. The quoted passage has nothing to do with immunity; in it, the court simply noted that the plaintiff had pleaded a due process violation under the Fifth and Fourteenth Amendments, but only the Fourteenth Amendment applied, not the Fifth, because NEIU is a state, not a federal, agency. *Id.* at 912 n.2.

Finally, Bolanos argues that Congress has abrogated sovereign immunity for the § 1983 and § 1981 claims in 42 U.S.C.A. § 2000d-7(a)(1), which provides:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation . . . title VI of the Civil Rights Act of 1964 [42 U.S.C.A. § 2000d et seq.], or the provisions of any

other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

Bolanos argues that § 1983 and § 1981 are statutes prohibiting discrimination and that NEIU receives federal funding. According to Bolanos, this subjects NEIU to this catch-all abrogation of immunity.[36] The court need not reach this issue. First, "NEIU is not a 'person' for the purposes of § 1983." *Alexander*, 586 F. Supp. 2d at 913 n.3. As to the § 1981 claim, "42 U.S.C. § 1981 does not create a private right of action against state actors[.]" *Campbell v. Forest Pres. Dist. of Cook Cty.*, 752 F.3d 665, 671 (7th Cir. 2014). Accordingly, even if there were no sovereign immunity barrier, Bolanos's causes of action in counts IV, V, and VI, alleging violations of § 1983 and § 1981, are barred.

Even if this were not the case, Bolanos also repeats arguments on the merits that the court found unpersuasive when dismissing Count IV against the individual Defendants. First, Bolanos does not explain how NEIU's conduct violated substantive due process rights. Substantive due process "protects plaintiffs only against arbitrary government action that shocks the conscience." *Montgomery v. Stefaniak*, 410 F.3d 933, 939 (7th Cir. 2005) (internal quotation marks omitted). "[A]n alleged wrongful termination of public employment is not actionable as a violation of substantive due process unless the employee also alleges the defendants violated some other constitutional right or that state remedies were inadequate." *Palka v. Shelton*, 623 F.3d 447, 453 (7th Cir. 2010) (citing *Montgomery*, 410 F.3d at 939). Bolanos has made no showing of any arbitrary action that shocks the conscience, no showing of any other

---

[36] The Supreme Court has declined to apply this provision to a statute prohibiting substantial burdens on religious exercise, because it was not "unequivocally" a statute prohibiting discrimination. *Sossamon v. Texas*, 563 U.S. 277, 292 (2011). Such reasoning might be a basis for doubt about whether §§ 1981 and 1983 are "unequivocally" statutes prohibiting discrimination, rather than means of redress for constitutional deprivations generally. At least one district court has held that this provision does not apply to § 1983. *Werdlow v. Caruso*, No. 09-11009, 2010 WL 148662, at *2 (E.D. Mich. Jan. 13, 2010) ("42 U.S.C. § 1983 is not a Federal statute prohibiting discrimination by recipients of Federal financial assistance.")

constitutional violation, and no basis for the conclusion that state remedies for any wrongdoing are inadequate.

Her procedural due process claim fares no better. To establish procedural due process violation, she must show she had a legitimate expectation of continued employment. *Moss v. Martin*, 473 F.3d 694, 700 (7th Cir. 2007). She also acknowledges that "[t]o show a legitimate expectation of continued employment, a plaintiff must show a specific ordinance, state law, contract or understanding limiting the ability of the state or state entity to discharge [her]." *Id.* Bolanos argues that she had a legitimate expectation of continued employment because the letter offering Bolanos the new position working for Weber provides that her position "is continuous unless limited by contract period or terminated in accordance with the Board of Trustees Governing Policies and Regulations." (Ex. 42 to Pl.'s Resp. to DSOF.) Defendants respond that these regulations do not protect her from termination: indeed the regulations appear to provide that employees "shall be employed by the Board and serve at the pleasure of the President." (NEIU Regulations, Ex. 28 to DSOF [65-29] 20.) These regulations do, however, provide *some* limitations on NEIU's ability to terminate employees; employees must receive some notice before they are terminated, for example. (*Id.*)

The court need not resolve whether these limitations are sufficient to create a property right, because even if they do, NEIU did not violate Bolanos's due process. If Bolanos had a constitutionally protected property interest in her job, NEIU must provide, at a minimum, notice of the charges, an explanation of its evidence, and an opportunity for Bolanos to tell her side of the story before an impartial decision-maker. *Head v. Chicago Sch. Reform Bd. of Trustees*, 225 F.3d 794, 803–04 (7th Cir. 2000). Defendants met those requirements. Bolanos received written notice of the charges against her, a hearing before five NEIU employees, two of whom she selected, where Defendants presented evidence and Bolanos had the opportunity to do so, as well. Bolanos makes no argument that any of these procedures was inadequate; instead Bolanos simply asserts that she had a property interest, but this alone is not sufficient to prove

that NEIU violated her due process rights. Bolanos has not presented sufficient evidence to go to the jury on this claim.

### B. NEIU (Count VII and VIII)

Count VIII alleged retaliatory discharge, while Count VII alleges a violation of the Stored Communications Act, 18 U.S.C. § 2701, arising from NEIU's termination of Bolanos's email account. "The SCA provides a private cause of action for unauthorized, intentional access to communications held in electronic storage." *Maremont v. Susan Fredman Design Grp., Ltd.*, No. 10 C 7811, 2014 WL 812401, at *6 (N.D. Ill. Mar. 3, 2014). While § 2701, which Bolanos cites, is a penal statute, § 2707 provides a private right of action against a party who knowingly accesses such stored communications without authorization—the statute also prohibits "obtain[ing], alter[ing] or prevent[ing] authorized access" to the communication.[37] Bolanos seeks prospective relief in the form of access to her e-mail account (Am. Compl. ¶ 142); it is unclear whether she wishes simply to retrieve information and documents within the account, or whether she intends to use the account on an ongoing basis. Bolanos has not explained how the files might help her pursue her degree, or even whether she is still pursuing that degree. (Pl.'s Resp. to DSOF ¶ 8) ("At all relevant times Plaintiff *was* a graduate student at NEIU[.]") (emphasis added.)

The SCA has an exception for access "by the person or entity providing a wire or electronic communications service." 18 U.S.C. § 2701(c)(1). An entity providing such a communication service can therefore access, and prevent authorized access, to that service.

---

[37] When the original complaint was dismissed, the court allowed an amended complaint so that Bolanos could address whether state sovereign immunity had been waived or abrogated. (Tr. of Proceedings [79] 4:10–5:16.) Bolanos has not done so, but Defendants have not renewed their argument, made at the motion-to-dismiss stage, that NEIU is immune from claims under the SCA. Although Bolanos has requested prospective relief with respect to the SCA claim, she has only pleaded that claim against NEIU, not the individual defendants. The court has found nothing to suggest the state has waived sovereign immunity for SCA claims, or that Congress abrogated that immunity. *See Sullivan v. Mericle*, No. 1:13 CV 0200, 2013 WL 2552221, at *2 (N.D. Ohio June 10, 2013) (holding that Congress did not abrogate sovereign immunity in the SCA).

Defendants argue that exception applies here because NEIU itself provided Bolanos's e-mail account. "Authorization . . . can be given by the entity providing the electronic communications service, which includes a private employer that provides email service to its employees." *Joseph v. Carnes*, 108 F. Supp. 3d 613, 616 (N.D. Ill. 2015) (quoting *Shefts v. Petrakis*, No. 10–CV–1104, 2011 WL 5930469, at *6 (C.D. Ill. Nov. 29, 2011)). Defendant also cites to *Fraser v. Nationwide Mutual Insurance Co.*, 352 F.3d 107, 109, 114–15 (3d Cir. 2003), *as amended* (Jan. 20, 2004), where the court held that the § 2701(c)(1) exception applied to an insurance company that accessed a former employee's e-mail account, and to *Reichert v. Elizabethtown Coll.*, No. CIV.A. 10-2248, 2011 WL 3438318, at *1, *5 (E.D. Pa. Aug. 5, 2011), where the court dismissed a SCA claim because the § 2701(c)(1) exception applied to access by a college to a former student's account. Both of these cases involved searches of employer-provided email, rather than termination of e-mail accounts. *Fraser*, 352 F.3d at 115; *Reichert*, 2011 WL 3438318, at *5. But, while the SCA generally prohibits both "access[ing]" and "prevent[ing] authorized access" to stored communications, the § 2701(c) exception applies to both actions. Accordingly, the employers in *Fraser* and *Reichert* were also entitled to prevent the employees from accessing their e-mails.

This argument appears to be persuasive, but the court need not reach it. Bolanos has not responded to Defendant's arguments on Counts VII and VIII, and is deemed to have withdrawn those claims under the SCA and retaliatory discharge. *See Sow v. Fortville Police Dep't*, 636 F.3d 293, 305 (7th Cir. 2011) ("Plaintiff waived all . . . claims by failing to argue that [they] were sufficient to survive summary judgment."). The court grants summary judgment to NEIU on Counts IV through VIII.

## B.        Weber and Hahs (Count V)

"The same requirements for proving discrimination apply to claims under Title VII, § 1981, and § 1983." *Egonmwan v. Cook Cty. Sheriff's Dep't*, 602 F.3d 845, 850 n.7 (7th Cir. 2010). The absence of evidence sufficient to reach a jury on Plaintiff's Title VII claims defeats

her claims under § 1983, and § 1981 as well. Defendants Weber and Hahs are therefore entitled to summary judgment on Count V. *See Cole v. Bd. of Trustees of N. Illinois Univ.*, 838 F.3d 888, 895, 901 (7th Cir. 2016) (affirming summary judgment for individual defendants and the university employer defendant on the § 1983 race discrimination claim for the same reasons).

### III.    Intentional Infliction of Emotional Distress (Count IX)

#### A.    NEIU

Count IX of the amended complaint alleges intentional infliction of emotional distress against NEIU and the individual defendants. As with Count VIII, Bolanos's brief addresses only the claim against the individual Defendants, not NEIU. Summary judgment is granted in NEIU's favor on Count XI.[38]

#### B.    Weber and Hahs

As for the individual Defendants, Weber and Hahs argue, first, that they have sovereign immunity for Bolanos's IIED claim, and in the alternative that the claim fails as a matter of law. Both arguments are well-founded.

Federal courts are "bound by state rules of immunity regarding state law causes of action." *Magdziak v. Byrd*, 96 F.3d 1045, 1048 (7th Cir. 1996). Whether Illinois has waived immunity for this claim turns on whether the action is more properly an action against the State. *Jinkins v. Lee*, 209 Ill. 2d 320, 330, 807 N.E.2d 411, 417–18 (2004). An action is against the State—and sovereign immunity is not waived—when there are:

> (1) no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) where the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State[.]

---

[38]    Bolanos claims that Defendants wrongly assert that the court dismissed her IIED claim (Pl.'s Mem. 6), but Defendants correctly note that the court dismissed without prejudice the first IIED claim *against NEIU* based on sovereign immunity. (Def.'s Mem. 3.)

*Id.* at 330, 807 N.E.2d at 418 (quoting *Healy v. Vaupel*, 133 Ill. 2d 295, 309, 549 N.E.2d 1240, 1247 (1990)). As explained here, there are no disputes concerning any of these factors.

### 1. Actions Beyond the Scope of Authority

Bolanos argues that Weber and Hahs acted outside the scope of their authority because (1) Hahs acted out of personal animosity, rather than NEIU's best interest, (2) Hahs did not follow NEIU policy during Bolanos's termination, and (3) Weber singled out Bolanos and did not discipline others who violated NEIU policy. None of these arguments overcome sovereign immunity. First, Bolanos argues that a defendant acts beyond the scope of authority when he or she acts with personal animosity toward the plaintiff; this principle appears to have originated in *Nikelly v. Stubing*, 204 Ill. App. 3d 870, 876, 562 N.E.2d 360, 364 (4th Dist. 1990). But the cases that Bolanos cites for this general principle do not support her argument. Here, as in *Nikelly*, there are no allegations that the defendants acted with personal animosity toward the plaintiff; instead they acted in what they perceived were the employer's best interest.[39] Bolanos argues that other employees had personal animosity toward her, but not Hahs or Weber. (Pl.'s Mem. 7.)

Bolanos believes that Hahs acted against NEIU's best interest in permitting other employees to violate rules about tardiness, timekeeping, and personal activities. (Pl's Mem. 7.) She cites to *Lewis v. Caterpillar Inc.*, 367 F. App'x 683, 685 (7th Cir. 2010), but that case simply acknowledges the obvious proposition that an employee who fails to arrive at work on time does not meet the employer's legitimate expectations. It does not stand for the notion that a university administrator has no discretion in enforcing work rules. In short, whether NEIU should have more closely disciplined other employees for minor rules violations has no bearing

---

[39] Bolanos also cites to *Welch v. Illinois Supreme Court*, 322 Ill. App. 3d 345, 354, 751 N.E.2d 1187, 1195 (3d Dist. 2001), and *Management Ass'n of Illinois, Inc. v. Board of Regents of Northern Illinois University*, 248 Ill. App. 3d 599, 617, 618 N.E.2d 694, 706 (1st Dist. 1993), but in both cases, like here, there was no evidence of personal animosity toward the plaintiff, and defendants did not act beyond the scope of their authority.

on whether Hahs believed it was in NEIU's best interest to terminate Bolanos. It is undisputed that Bolanos continued to monitor and confront employees she did not supervise even after being told to stop. (Pl.'s Resp. to DSOF ¶¶ 38–39.) Further, Hahs received a memorandum recommending Bolanos's termination that cited Bolanos's allegedly threatening behavior. (Pl.'s Resp. to DSOF ¶ 60.) Faced with such allegations, Hahs could conclude that it was in NEIU's best interest to terminate Bolanos, and Bolanos has presented no evidence to the contrary.

That Bolanos believes that Hahs did not follow NEIU policy does not alter the analysis. (Pl.'s Mem. 7.) "A State employee's violation of policy, regulation, or even statute does not necessarily avert the application of sovereign immunity." *Welch v. Ill. Supreme Court*, 322 Ill. App. 3d 345, 352, 751 N.E.2d 1187, 1194 (3d Dist. 2001). Even "[b]y breaking workplace rules[,] . . . employees do not necessarily act outside the scope of their state employment." *Jackson v. Alverez*, 358 Ill. App. 3d 555, 561, 831 N.E.2d 1159, 1164 (4th Dist. 2005). In *Jackson*, the court held that defendants acted within the scope of their authority even when they violated workplace rules by supervising patients with gross carelessness. *Id.* at 561, 831 N.E.2d at 1164–65; *cf. Carstens-Wickham v. Sedycias*, 2016 IL App (5th) 150472, ¶¶ 41, 60 N.E.3d 138, 145 (finding that defendants exceeded the scope of their authority when they sent documents about the plaintiff to the president of the state university, which violated university policies because it was done outside of official processes).

Bolanos disputes Defendants' assertion that Hahs had the authority to "place the matter on the [Board of Trustees'] Agenda to determine whether the recommendation to terminate Plaintiff would be accepted or rejected" (DSOF ¶ 61), but she cites to no evidence that Hahs actually acted outside her authority. Instead, Bolanos notes that Hahs failed to meet with Bolanos personally before the notice of termination was issued (Pl.'s Resp. to DSOF ¶ 61), but that alleged misstep alone does not constitute action outside the scope of her authority.

Third, Bolanos claims that Weber acted outside the scope of his authority by singling Bolanos out and not disciplining employees who violated NEIU work rules. As explained above,

however, Weber disciplined Bolanos for conduct that no other employee engaged in: disruptive and unauthorized efforts to "correct" other workers. The fact that he allegedly chose to ignore other wrongdoing says nothing about whether discipline of Bolanos was outside the scope of his authority. The fact that NEIU has a "universal disciplinary process" for civil service employees is irrelevant.

### 2. Duties Not Owed to the Public Generally

For the second factor to support a waiver of sovereign immunity, Weber and Hahs must have allegedly breached a duty owed to the public generally. The crux of this factor is the "source of the duty" test—if the duty allegedly breached "arises solely by virtue of his state employment," this factor will not support sovereign immunity. *Brandon v. Bonell*, 368 Ill. App. 3d 492, 505, 858 N.E.2d 465, 480 (2d Dist. 2006); *see Hampton v. City of Chicago*, 349 F. Supp. 2d 1075, 1079 (N.D. Ill. 2004) (remarking that the source-of-the-duty test "amplifi[es]" the second factor). "A State employee who breaches a duty he owes regardless of his State employment is no more entitled to immunity than is a private individual who breaches that same duty[.]" *See Jinkins*, 209 Ill. 2d at 331, 807 N.E.2d at 418 (quoting *Currie v. Lao*, 148 Ill. 2d 151, 158–60, 1592 N.E.2d 977, 980 (1992)).

Bolanos argues that Hahs breached the duty to follow NEIU policy for termination of non-union employees for cause. (Pl.'s Mem. 7.) By definition, however, this duty is specific to Hahs's state employment and not owed to the general public. Bolanos's only argument with respect to Weber is that he singled her out for discipline and did not discipline others. (Pl.'s Mem. 7.) Any duty Weber had to impose consistent discipline on NEIU employees is, again, not one owed to the general public. *See Cortright v. Doyle*, 386 Ill. App. 3d 895, 903–05, 898 N.E.2d 1153, 1160–62 (1st Dist. 2008) (holding that issuing performance evaluations were within the defendants' capacities as supervisors, even in the context of an IIED claim, and were not owed independently of state employment).

### 3.    Complained-of Actions Within Normal Function of the State

Finally, the court examines whether Weber or Hahs acted outside the normal and official functions of the State.  "Evaluating, disciplining, and setting assignment deadlines [are] all within the normal and official functions of . . . supervisors as state employees."  *Id.* at 905, 898 N.E.2d at 1162.  Bolanos does not claim that Weber or Hahs acted outside of their normal functions.  Whether Weber disciplined other employees differently or Hahs followed termination policy, both were acting as NEIU employees when doing so.  The third factor thus does not support a waiver of sovereign immunity.

### C.    Merits of Bolanos's IIED Claim

Bolanos's IIED claim fails on the merits, as well.  To recover for IIED, a plaintiff must show (1) that the defendant's behavior was "truly extreme and outrageous," (2) the defendant must intend that the conduct will cause severe emotional distress, or know there is a high probability such distress will occur, and (3) the defendant's conduct must actually cause such distress.  *McGrath v. Fahey*, 126 Ill. 2d 78, 86, 533 N.E.2d 806, 809 (1988).  The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency."  *Pub. Fin. Corp. v. Davis*, 66 Ill. 2d 85, 90, 360 N.E.2d 765, 767 (1976) (quoting Restatement (Second) of Torts § 46, cmt. d (Am. Law Inst. 1965)).

In the employment context, "courts have found extreme and outrageous behavior . . . where the employer clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment."  *Honaker v. Smith*, 256 F.3d 477, 491 (7th Cir. 2001) (collecting cases).  "Another factor . . . is whether the defendant reasonably believed that his objective was legitimate; greater latitude is given to a defendant pursuing a reasonable objective even if that pursuit results in some amount of distress for a plaintiff."  *Id.*  Illinois courts "have found outrageous behavior where defendants threatened to exercise their power to coerce plaintiffs into doing

something they would not otherwise do." *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736, 747, 742 N.E.2d 858, 867 (1st Dist. 2000).

No authority supports the argument that Weber or Hahs's conduct was extreme or outrageous. Bolanos alleges only that workplace discipline was inconsistent, and that there was no training on issuing discipline. Illinois courts hesitate to find IIED causes of action in "everyday job stresses resulting from discipline, personality conflicts . . . or even terminations[.]" *Id.* at 746, 742 N.E.2d at 867. Disciplining employees differently is not an abuse of an employer's power. *Compare Welsh v. Commonwealth Edison Co.*, 306 Ill. App. 3d 148, 154, 713 N.E.2d 679, 684 (1st Dist. 1999) (finding that demoting, transferring, and forcing an employee to perform humiliating tasks was not extreme or outrageous because it was not coercive) *with Graham*, 318 Ill. App. 3d at 748, 742 N.E.2d at 868 (finding that a "five-month-long sham investigation of [the employee] in retaliation for . . . reporting nuclear safety violations" was extreme and outrageous). Bolanos was not coerced into doing anything, and imposing different discipline for different offenses is not clearly abusive.[40]

Because Defendants have sovereign immunity and Bolanos's claim for IIED fails as a matter of law, summary judgment is granted on Count IX.

### CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment [61] is granted.

ENTER:

*Rebecca R. Pallmeyer*

Dated: January 4, 2017

_____
REBECCA R. PALLMEYER
United States District Judge

---

[40]    Bolanos also lists several ailments that she suffers from (Def.'s Resp. to PSOAF ¶ 137), but she has not explained how any of Weber and Hahs's behavior caused these ailments.